IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 21, 2024 Session

**STATE OF TENNESSEE v. JACKIE LEE KIRBY**

**Appeal from the Criminal Court for McMinn County**
**No. 20-CR-301      Andrew M. Freiberg, Judge**

_____

**No. E2023-00545-CCA-R3-CD**

_____

Defendant, Jackie Lee Kirby, was convicted after a bench trial of attempted aggravated kidnapping. On appeal, Defendant argues that the evidence was insufficient to support his conviction and that structural constitutional error occurred when the trial court left the bench three times while defense counsel refreshed the victim's recollection using audio recordings. Following a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER, J., joined. JAMES CURWOOD WITT, JR., J., not participating.

Patrick Frogge, Executive Director, and Brennan M. Wingerter, Assistant Public Defender—Appellate Director, Tennessee Public Defender's Conference; C. Richard Hughes, Jr., District Public Defender; and Tammy M. Harris-Crayne and Paul Rush, Assistant District Public Defenders, for the appellant, Jackie Lee Kirby.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; and Shari Lynn Tayloe, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural History**

This case arises from a September 5, 2020 incident at North Etowah Baptist Church ("the church"). The November 2020 term of the McMinn County Grand Jury issued an

indictment charging Defendant with attempted aggravated kidnapping resulting in bodily injury to the victim, Callie Stewart. Defendant subsequently waived his right to a trial by jury.

At the bench trial, Ms. Stewart testified that, on the morning of Saturday, September 5, 2020, between 8:00 and 9:00 a.m., she went to the church to study in the library. She explained that she was a student at Tennessee Tech University, that the church had better Wi-Fi than her home, and that her mother was the church librarian and had a key to the building. She noted that the church was "fairly good-sized." To Ms. Stewart's knowledge, no one else was at the church that morning.

Ms. Stewart testified that she got out of her car and was walking to the door when a "beat-up red car" pulled up beside her, and a man she had never seen before rolled down the window and asked her for directions to Polk County. Ms. Stewart later identified Defendant in the courtroom as the man she saw. Defendant asked her if he could go inside the church to use the restroom. Ms. Stewart described Defendant as being older and wearing "beat up clothes, [a] baseball cap, [and a] green shirt." Ms. Stewart stated that she hesitated before telling him that he could. Ms. Stewart said that Defendant did not seem to be in a hurry and that he did not exit his car until she said that he could go in to use the restroom.

Ms. Stewart testified that she unlocked the back door and held it open for Defendant and that she pointed down the hallway in the direction of the restroom. Ms. Stewart said that she "tried to stay behind him, but [she] realized that the light around the corner was off, and so [she] kind of hurried ahead at some point to make sure that was on by the time he got there." She stated that, when they reached the corner, she pointed out the restroom and that she turned around and walked to the library after Defendant went inside.

Ms. Stewart identified a photograph of the church library, which showed a rectangular room containing bookshelves and a desk with glass double doors on the left wall closer to the viewer. The door closest to the camera was opened into the library. Ms. Steward testified that glass doors led to the hallway and that her mother customarily left one door open after church on Sundays. Ms. Stewart stated that a door across the room facing the camera led to a bathroom, which had been closed during the incident.

Ms. Stewart testified that she set her bags in a chair at a table not shown in the photograph, that she unhooked her pepper spray from her backpack strap, and that she "went to close the door to the library, just in case[.]" When asked why she retrieved her pepper spray, Ms. Stewart said,

- 2 -

I am cautious, I'm aware that bad things happen in the world, and I want to be prepared if they are. I wouldn't say I'm overly cautious, but I do want to protect myself should the event arise and [] Defendant's body language had kind of alerted me to be somewhat aware.

Ms. Stewart stated that Defendant was "already on his way back down the hall" before she could close the library door and that she stood by a desk across from the double doors.

Ms. Stewart testified that Defendant entered the library, and she marked his location on the photograph with an "X" at the edge of the open glass door; she noted that Defendant stood inside the door. She marked her own location on the photograph with a "C" halfway between the door and a desk on the right side of the camera frame.

Ms. Stewart testified that she told Defendant that she had verified the location of Polk County and that he stated, "I'm not here for the bathroom." Ms. Stewart said that she became afraid and told Defendant that she had pepper spray. Ms. Stewart stated that Defendant replied, "I don't give a d--n about pepper spray, now get your a-- in there," and pointed down the hallway toward the restroom. She said that Defendant leaned toward her and took a step in her direction. When asked if she was able to get out of the room, Ms. Stewart replied negatively and stated that Defendant was in the doorway. She agreed that the doorway was the library's only exit.

Ms. Stewart testified that, when Defendant told her to get into the restroom, she pulled out her cell phone, "activated Siri" to call 911, pulled out her pepper spray, sprayed it, and "started to retreat." She stated that Defendant said, "[O]h s--t," and turned and fled, and that she chased him. Ms. Stewart said that she saw Defendant push open the church's exit door, that she turned around and ran back into the library, and that she entered and locked the library's bathroom door before entering and locking the door to an interior closet in the bathroom. She did not see which direction Defendant went after leaving the church.

Ms. Stewart testified that she called 911 and told the dispatcher that a man had tried to attack her, then waited until the police arrived. Ms. Stewart described Defendant to the police in person and in a written statement.

Ms. Stewart testified that she was "affected" by the pepper spray when she deployed it and while following Defendant to ensure he was leaving. Ms. Stewart noted that, when she used the pepper spray, she held her arm out and aimed at Defendant, that it formed a cloud, and that she walked through "lingering" pepper spray in the air. She said that she felt stinging in her eyes and that her eyes were "very sore and itchy and raw" for about one week after the incident. Ms. Stewart stated that an officer helped her rinse her eyes with a

large bottle of water and baby shampoo, which helped; she said, though, that the effects "were still there." She agreed that the incident occurred very quickly.

On cross-examination, Ms. Stewart acknowledged that she gave verbal statements to 911 and Officer Huffer[1], a written statement, and a second statement to Officer Justin Weir, and that she testified at the preliminary hearing.

When asked whether she told the 911 dispatcher that a man had tried to follow her into the church, Ms. Stewart could not recall. Ms. Stewart agreed that listening to the recording would refresh her recollection, although she noted that she was more startled during the call than on later occasions.

The State objected to the recording's being played in front of the trial court. The trial court stated,

> That actually is, I'm the trier of fact, if we had a jury, it would be a jury out, so I do agree with that procedure now that the first witness was sworn and jeopardy has attached. So, if you wanted to work with Court Officer Leigh and she's afforded a time to review it, and then I'll just be in chambers and someone, have Officer Leigh come retrieve me.

Defense counsel, who did not object, asked the trial court if the parties could "use this time for a brief time out." The trial court responded, "Oh, yes, at this time if the parties wanted to use the restroom, that's fine." The proceedings were not transcribed until the trial court returned.

When testimony resumed, Ms. Stewart agreed that she told the dispatcher that a man tried to follow her into the church and assault her, which did not convey that she had let Defendant in, gave him permission to use the restroom, and escorted him down the hallway. Ms. Stewart noted that she recalled "having trouble articulating what [she] was feeling and experienced" and that she remembered "at the time of the call that it wasn't particularly accurate, but [she] didn't know how to state what had happened." Relative to her statement about Defendant's trying to assault her, Ms. Stewart explained, "That's what I had thought was happening at the time, so that's what I told them." She acknowledged that she never used the word kidnapping but reiterated her difficulty articulating what had happened. Ms. Stewart stated that she did not allow Defendant to touch her and that he never stated an intent to touch her, although she could not "say whether or not he tried[.]" She acknowledged that Defendant never displayed or threatened to use a weapon during the incident.

---

[1] Officer Huffer's first name does not appear in the record.

- 4 -

When asked whether she assumed Defendant was there to assault her because she was "paranoid from the moment he pulled up," Ms. Stewart responded that a more accurate descriptor would be "cautious." Ms. Stewart did not recall whether she told the police that she was paranoid and agreed that hearing the recording of her police statement would refresh her recollection. Again, the State requested that the trial court "step off the bench." Defense counsel noted for the court that "there's probably going to be many of these, just so you know," and did not object to the court's leaving.

When testimony resumed, Ms. Stewart stated that she was "simply just a cautious bubble of paranoi[a] all the time, not specific to this event." She noted that she was "no stranger to the fact that young women are preyed on[.]" Ms. Stewart said that Defendant's "mere presence caused [her] to be cautious, not necessarily paranoid." She agreed that she told one of the officers that she had her pepper spray ready when Defendant pulled up. Ms. Stewart noted that the pepper spray was easily accessible on her backpack strap and "technically always ready." She stated that she generally held the pepper spray while wearing her backpack because it "jingles and gets on [her] nerves." She denied that it was ready to be deployed, and she said that she did not disconnect the pepper spray from her backpack until she was in the library.

Ms. Stewart testified that she carried pepper spray for the same reason that anyone would—in case "something malicious" happened to her. She stated that she was aware at the time of the incident that a person spraying pepper spray could "receive some of the fallback" from it even if the person did not walk through it. Ms. Stewart said that it was "simply one of the cons" of pepper spray, and she agreed that she took the risk of getting it in her eyes to "make sure" she sprayed Defendant.

Ms. Stewart acknowledged that she told the 911 dispatcher that Defendant told her to get inside the bathroom and lock the door, although she did not independently recall making the statement. She reiterated that she was "a little shaken" and that her statement was not "exactly accurate to what had happened[.]" Ms. Stewart added that she had assumed Defendant would have wanted the bathroom door locked but that she did not think he told her as much. Ms. Stewart stated that she assumed Defendant was going to assault her because he told her to get into the bathroom. She also assumed that it "was understood" Defendant would lock himself in the bathroom with her.

When defense counsel asserted that Defendant never used the word "bathroom," Ms. Stewart responded that she had never seen Defendant at the church in her nine years of membership there and that the bathroom would have been the only place to which Defendant would have known to refer when he pointed in the direction of the hallway bathroom and told her to get in "there." Ms. Stewart acknowledged that the bathroom in

question was down the hall, around a corner, and down another hallway; she estimated that the library was between five and ten seconds away from the bathroom, and she said that one could not see the bathroom from inside the library. Ms. Stewart disagreed that Defendant told her to "get over there" or that he could have been instructing her to go to the hallway wall. She stated that she specifically recalled Defendant's "words verbatim. He said, '[G]et your a-- in there.'"

When asked whether she told the police that Defendant told her to "get over there," Ms. Stewart responded, "I was potentially paraphrasing, but he said in. I still hear that word in my mind, that whole sentence." Defense counsel began to question Ms. Stewart about her written police statement, but realized while asking the question that Ms. Stewart's written statement included Defendant's command for her to "get in there." Ms. Stewart said that she thought she quoted Defendant to both officers to whom she gave a verbal statement. She noted, though, "If it was recorded wrong, then I was paraphrasing."

At this point, defense counsel asked Ms. Stewart, "All right, if I have a video to show you that you never mentioned the bathroom to Officer Huffer, would that refresh your recollection?" The State objected, and the trial court sustained the objection, finding that it had not been established that Ms. Stewart needed her recollection refreshed. The trial court asked defense counsel to assert "as an officer of the [c]ourt" that she knew Ms. Stewart had used different language when speaking to Officer Huffer. Defense counsel stated, "She said get in there. She never said that to Officer Huffer, and I know for a fact, so it is impeachment, and I can play the video." The trial court stated that it would step out "for that purpose." When testimony resumed, Ms. Stewart testified that she did not say anything to Officer Huffer about Defendant's telling her to get into the bathroom. She maintained that she was "paraphrasing the event, so [she] wasn't quoting him directly."

Ms. Stewart acknowledged in her preliminary hearing testimony that Defendant was about one and one-half yards away from her when she pepper sprayed him. When asked whether the locations she marked on the photograph of the library were less than one and one-half yards apart, Ms. Stewart stated that she was not "great with depth perception." She said, though, that her estimate of the distance between herself and Defendant was "fairly accurate."

Ms. Stewart acknowledged her statement to the 911 dispatcher that she "didn't hang around long enough" to see if Defendant was gone; she explained that he saw him leave the building but did not see him drive away. She agreed that she chased Defendant halfway down the hallway and that he was running the entire time. Ms. Stewart further agreed that, when she pointed the pepper spray at Defendant, he took a step back and that she "sprayed him anyway[.]" Ms. Stewart reiterated that the version of events she gave the dispatcher

was "not the most correct telling of the events" and that she was "pretty frazzled" at the time.

Ms. Stewart testified that, after the incident, she tried to call 911, but that "the call failed[.]" She tried to call various family members, but those calls also failed. Eventually, her aunt picked up, "screamed at [her]," and told her to call 911. She estimated that five to ten minutes elapsed in total before she connected with the 911 dispatcher.

When asked whether her written and verbal statements that Defendant was in front of her "the entire time" were true, Ms. Stewart testified that she had watched a surveillance recording with the prosecutor and that "it jogged a little bit of [her] memory" that she had hurried ahead of Defendant for a "few yards" from the middle of the hallway to the corner to get to the light switch before him. Ms. Stewart disagreed that she had misremembered the events due to stress, and she noted that, although she "perhaps forgot some minor details, . . . everything that [she] recalled felt very accurate," and she averred that her statements were "mostly accurate."

When asked whether forty-seven seconds was enough time to close and lock the library door, Ms. Stewart testified that, to her recollection, the forty-seven-second interval defense counsel cited included the time it took her to walk from the hallway light switch; she estimated that it "may have been [thirty] seconds[.]" Ms. Stewart said, "Either way, regardless of the time, I went, I sat down my backpack, I pulled up directions to Polk County, I was thinking of what to do next, and by the time I had thought to close the library door, . . . it was . . . too late."

Ms. Stewart testified that she had gone to the library door to remove a door stop and close it but that she heard Defendant's opening the bathroom door and walking back down the hall. She agreed that, by the time she decided to pepper spray Defendant, he was "already backing up." She further agreed that Defendant was in the library for about fourteen seconds before she "ran him out[.]"

When asked whether she got out of the library "the minute that [she] wanted to get out[,]" Ms. Stewart replied negatively. Ms. Stewart stated that she did not feel like she could leave and that Defendant would have stopped her if she had tried to go around him in the doorway. When asked whether Defendant made any attempt to stop her from leaving, Ms. Stewart replied that she never attempted to leave because she was too afraid to do so.

Ms. Stewart testified that she got some pepper spray in her eyes while spraying Defendant, although most of her exposure occurred when she followed him; she noted that the hallway was "full of pepper spray, there's really no way to avoid it." Ms. Stewart

acknowledged her statement to Officer Huffer that she felt stupid; she explained that she thought she had made a mistake by letting Defendant in to use the bathroom. Ms. Stewart stated that she told the officers that she had "grabbed" her pepper spray when Defendant pulled up in his car.

Relative to her statement to Officer Huffer about her readiness to use her pepper spray in the parking lot and in the library before Defendant returned, Ms. Stewart clarified that she "was saying that [she] was ready to use pepper spray rather than [she] had the pepper spray ready." Ms. Stewart stated that, when Defendant entered the library, the pepper spray was in her hand inside her pocket. She said that she pulled out the pepper spray after Defendant told her that he did not "give a d--n" about it. Ms. Stewart stated that, if she made a statement to Officer Huffer indicating that Defendant said he was not there to use the bathroom immediately upon entering the church, it would have been because she had misunderstood and thought Officer Huffer was asking about Defendant's entering the library.

Ms. Stewart testified that her father, who was "a cautious man," her mother, "society, and stories in the news, everyone's told [her] to be cautious against strangers, but especially men." She noted that she was "a small woman in a dangerous world." Ms. Stewart said, though, "I was cautious, but I don't believe I was too biased in the event. If I was, I would never have let him in in the beginning." She said that she had never used her pepper spray before. Ms. Stewart stated that she intended for Defendant to feel "[t]hreatened enough to not threaten [her] in return" when she pointed the pepper spray at him. Ms. Stewart clarified that Defendant backed away as she sprayed him. She said that she pulled out the pepper spray, aimed it, sprayed it, and told Siri to call 911 in the same two or three-second span of time.

Ms. Stewart testified that Defendant's leaning toward her, taking a step toward her, and telling her to "get [her] a-- in there" while pointing to the bathroom made her feel threatened. She considered his actions to be aggressive. Ms. Stewart acknowledged her preliminary hearing testimony that she followed Defendant because she was worried he would come back, in which case she intended to pepper spray him again.

Ms. Stewart noted, "I believe . . . what you consider to be inconsistencies in my statements were simply misunderstandings between each statement . . . . They may have been misordered, I may have used different words, but I feel that my story has not changed from the beginning, except for maybe minor details." She agreed that, at the time of the incident, she was twenty years old and attending college. She said that she lived in a dormitory and was home for Labor Day weekend.

- 8 -

When asked whether she told Officer Weir that Defendant never used the bathroom, Ms. Stewart replied that she assumed that was the case because Defendant was only in the bathroom for a short amount of time. When asked whether she could not "really say with any certainty what [Defendant] was there to do that day," Ms. Stewart responded that she could only say that she felt threatened based upon what she experienced.

On redirect examination, Ms. Stewart testified that she did not feel she could safely leave the library when Defendant was blocking the door. She agreed that she pepper sprayed Defendant after he told her to go to another place.

Jonathan Rayburn testified that he was the administrative pastor for the church, which involved office operations and "IT." He stated that, on September 5, 2020, the church was not open to the public and that, to his knowledge, no one was there working. Mr. Rayburn said that the church had two DVR recording surveillance systems with nine cameras in the parking lot and at the entrances, nine cameras in and around the "nursery area," and Ring video doorbells at the nursery and office doors. The library did not contain a camera.

Mr. Rayburn testified that the Ring doorbells did not record any footage of the incident. Mr. Rayburn assisted law enforcement to obtain relevant recordings of the incident. He agreed that he had reviewed with the prosecutor videos taken from the two DVR systems, as well as a body camera video "showing a video of the nursery." He noted that the nursery system's time stamp was one hour earlier[2] than the other system; he theorized that one of the systems might not have automatically adjusted for the seasonal time change.

A series of four video recordings was received as an exhibit. The first recording was a body camera video of a screen playing a surveillance recording. Text on the screen read "Camera 08." The time stamp on the recording began at 7:34:53, when lights came on in the hallway.

Mr. Rayburn testified that the first recording showed a window in the church library. The screen showed a hallway area with a wall and sliding glass window facing the camera, behind which was an office desk. The bottom of a set of stairs was perpendicular to the hallway running to the left of the wall. A door was to the right of the set of stairs.

In the recording, the victim pointed at the door beside the stairs, and Defendant entered the door and closed it behind him at 7:35:03. Defendant had an uneven gait. Ms.

_____

[2] Our review of the recordings reflects that the two nursery system recordings' time stamps were about one hour, twelve minutes earlier than the other two recordings.

Stewart walked out of the bottom of the camera frame at 7:35:00. Defendant returned to the hallway at 7:35:36 and walked out of the bottom of the camera frame at 7:35:45.

The second recording reflected an interior entryway. Ms. Stewart's white car was parked in front of glass double doors, and Ms. Stewart was standing outside of her car and wearing a backpack. The camera was adjusted such that the area outside the doors was washed out with light. Beginning at time stamp 8:47:16, Defendant was barely visible in the top center frame outside; he was driving a red sedan and could be seen talking to Ms. Stewart from his car. At 8:47:36, Ms. Stewart turned and unlocked the door, and Defendant exited his car. Ms. Stewart held one of the doors open while looking at her cell phone. Defendant entered, and Ms. Stewart pointed ahead of him. Both of them walked out of the bottom camera frame. At 8:48:20, the hallway lights came on; at 8:48:38, the light inside the room with the partial window came on. At 8:49:38, Defendant reappeared and scampered down the hallway for a couple steps before slowing down and walking outside.

The third recording containing the text "Camera 06" reflected the inside of the room with the window and desk; a door to the right was open. Beginning at time stamp 7:34:49, Ms. Stewart walked down the hall with Defendant behind her. Ms. Stewart held her hand to a wall; lights came on; Ms. Stewart pointed; and Defendant crossed in front of her. At 7:35:08, Ms. Stewart turned around and entered the door to the left back down the hallway. Defendant passed the window at 7:35:41 and entered the door to the left at 7:35:56; he walked far enough to pass the threshold and go out of the camera frame. At 7:36:09, Defendant ran out into the hallway for a couple of steps then slowed down and walked out the exterior door. At 7:36:11, Ms. Stewart briskly stepped into the hallway, watched Defendant leaving, and darted back inside the door three seconds later.

The fourth recording containing the text "South Parking" began at time stamp 8:46:28. Mr. Rayburn testified that the camera showed the parking lot from above the entrance shown in other recordings. The church parking lot was bordered at the top and right side by roadways. Ms. Stewart's white car was visible pulling up to the building at a location obscured by the building's roof; her car disappeared at 8:46:44. Defendant's red car was traveling along a road running along the far side of the parking lot. After pausing at a stop sign, Defendant turned right, then followed Ms. Stewart's car and stopped just above the roof line at 8:46:56. Defendant exited his car at 8:47:41 and walked under the roof line. At 8:49:49, Defendant reentered his car and drove toward the top of the camera frame before turning left down the road running along the top side of the parking lot, which was the opposite of the direction he was originally traveling.

Mr. Rayburn testified that, at the end of the recording, Defendant drove south on a road that connected to 3rd Street, which eventually led to Highway 411, which was "the main artery through Etowah" with restaurants and gas stations. Mr. Rayburn said that it

did not take long for a person to drive from the church to the nearest gas station on Highway 411.

Etowah Police Department Patrol Officer Justin Weir testified that, on September 5, 2020, he responded to a call that a man had tried to assault a woman at the church. After Officer Weir walked to the back entrance of the church, Ms. Stewart came outside. He noted that Ms. Weir was "very emotional," "very distraught," and that she "had a redness about her eyes[.]" Ms. Stewart told Officer Weir that she had gotten pepper spray in her eyes "during the altercation" with Defendant; Officer Weir advised Ms. Stewart about how to remove the pepper spray. Ms. Stewart described Defendant and his car to Officer Weir. Officer Weir asked Officer Huffer to speak with Ms. Stewart and "just get the key facts" because Ms. Stewart was upset.

Officer Weir testified that he drove around the area and unsuccessfully searched for Defendant before returning to the church and reviewing the surveillance footage with Mr. Rayburn. Officer Weir took still photographs of Defendant and his car using his cell phone; he noted that Defendant's appearance matched Ms. Stewart's description.

Officer Weir stated that another officer posted the photographs on social media and that they received a tip regarding Defendant's identity. Officer Weir was unfamiliar with Defendant and met him for the first time when Detective Michael Richmond and another officer took Defendant into custody. Defendant and his red car were located in a hay field on Highway 163. Officer Weir said that Defendant was wearing the same clothing shown in the surveillance recordings. Officer Weir transported Defendant to the McMinn County Jail.

Officer Weir testified that he was exposed to pepper spray at the police academy but that his eyes were more sensitive to it because he had had "Lasik surgery[.]" Officer Weir stated that he had trouble talking, seeing, and thinking after being pepper sprayed. Officer Weir testified that he sent someone to get baby shampoo to help Ms. Stewart get the pepper spray out of her eyes and calm herself.

On cross-examination, Officer Weir recalled asking Ms. Stewart if she felt threatened or in fear. He noted that, after speaking to Ms. Stewart, he believed the incident was "more than just an assault due to her not being able to get out of the room and being in fear." Officer Weir opined that Defendant's blocking the doorway was evidence of Ms. Stewart's confinement or inability to leave and that Ms. Stewart's being in sufficient fear to use pepper spray to get Defendant out of the room was evidence of unlawful confinement.

Officer Weir stated that, other than Defendant's statements included in Ms. Stewart's account of the incident, he was unaware of any threats Defendant made. He said that Defendant did not use force to confine Ms. Stewart "other than blocking the doorway." Officer Weir stated that Defendant arguably used fraud by entering the church on the pretext of having to use the restroom. Officer Weir acknowledged that he did not know the exact time Defendant spent in the restroom or whether Defendant did, in fact, use the restroom.

Detective Richmond testified that, on September 5, 2020, he responded to Officer Weir's call to the church, collected photographs from the surveillance recordings to distribute to the media, and spoke with a McMinn County Sheriff's Deputy, who had recognized Defendant. Detective Richmond said that the police also received tips that Defendant's car was seen in east Etowah near County Roads 882 and 875. Defendant's car was eventually located nearby at a farm, and Defendant was arrested at the same farm about two hours later.

Detective Richmond testified that he issued *Miranda* warnings and that Defendant chose to speak to him. Detective Richmond stated that he was in a hurry when Defendant was located and forgot his body camera; as a result, the statement was not recorded. According to Detective Richmond, Defendant initially denied having been in Etowah and acted like he did not know why the police were there. Defendant later stated that he grew up in the area of County Roads 882 and 875, that he "was asking for directions at some point," and that he had an emergency related to a medical condition and had to use the restroom at the church.

On cross-examination, Detective Richmond stated that he did not have Defendant sign a written waiver of rights form. Detective Richmond said that Defendant "did say something about pepper spray." He noted that he recalled "a lot of" Defendant's statement because it was a "pretty serious incident" but that there were "some things that wasn't as important to [Detective Richmond] at the time that [he] would not remember."

Detective Richmond testified that he was "sure" Ms. Stewart told him what happened, but he did not recall when or the content of their conversation. Detective Richmond noted that he never said he obtained a statement from her. Detective Richmond stated that it was not common practice for him to "continue to ask a victim several questions after she's went through a harmful event like that[.]" He maintained that he remembered the content of his conversation with Defendant.

Kenneth Shelton, Jr., testified that he had arranged to meet Defendant in a hay field around Labor Day in September 2020. He recalled that, on that day, the police came and asked when Defendant arrived and "the state he was in[.]" Mr. Shelton stated that he began

- 12 -

loading bales of hay between 7:00 and 7:30 a.m., that Defendant was supposed to meet him there, and that Defendant arrived late, between 9:00 and 9:30 a.m.  Mr. Shelton said that Defendant's behavior was "[v]ery unusual" and that he seemed intoxicated.  Defendant did not explain his lateness beyond saying that he was "running behind."

After the close of the State's evidence, Defendant elected to testify.  Defendant stated that he was sixty-one years old at the time of the incident.  He stated that he pulled into the church parking lot intending to urinate there because he had a medical condition that caused urinary incontinence and frequent urination, which he treated with Lasix.

Defendant testified that he did not initially see Ms. Stewart when he pulled into the church's parking lot; he had never seen her before.  He stated that Ms. Stewart rolled down her car's passenger window and spoke to him while they were still seated in their respective cars; her car was in a breezeway, and Defendant's car was "outside beyond the pillars of the breezeway."  Defendant said that he asked Ms. Stewart if he could use the restroom because he "was coming from Polk County and . . . didn't have nowhere to stop[.]"  He noted that he was "actually trying to get to the Jiffy on Highway 30."  Defendant stated that Ms. Stewart unlocked the door and told him that he could use the restroom.  Defendant averred that he did not exit his car until "it was okay."

Defendant testified that he walked behind Ms. Stewart in the church.  He maintained that he did, in fact, use the restroom, explaining that he urinated a small amount frequently.  Defendant stated that he did not see in which direction Ms. Stewart went.  Defendant narrated the following version of events:

> I came back out and started back down the hall and it kind of sounded like somebody was off to my left, and I thought to myself, I didn't know who was in that room, and then when I stepped through the doorway, the first thing I seen was pepper spray.

Defendant stated that Ms. Stewart had the pepper spray in her right hand and a cell phone in her left hand and that she announced that she had pepper spray.  Defendant said that he felt he was being threatened and told her "that I was only there for the restroom, and I didn't give a d--n about the pepper spray."  He stated that he also told Ms. Stewart to "get her a-- over there," meaning to "get away from [him] with that pepper spray," and that he "recoiled" and began backing up and turning sideways when she pointed the pepper spray at him.  Defendant noted that he had heard "horror stories" about people being sprayed with pepper spray and that he knew that he would likely be sprayed.  He said that he did not hear Ms. Stewart speaking to anyone on the cell phone but added that, at the time she began spraying the pepper spray, she "had Siri to call" 911.

- 13 -

Defendant testified, "Right after I got a-s-s out of my mouth, she lit me up." He stated that Ms. Stewart stepped forward "to get more of a direct hit" and that she sprayed the left side of his face. Defendant said that he had made no attempt to exit the building before Ms. Stewart sprayed him.

When asked whether he was blocking Ms. Stewart from leaving the library, Defendant responded negatively and averred that he was "inside the doorway, [he] was already in the room." He asserted that there was space for Ms. Stewart to get out through the door and that Ms. Stewart never attempted to leave before she chased him out of the library. Defendant stated that his intent "[w]asn't to harm her in, no way. [He] thought there was somebody else in that room." Defendant denied that he was going to kidnap, assault, or harm Ms. Stewart. He further denied that he ever touched Ms. Stewart, threatened her verbally, or approached her in a threatening manner. Defendant agreed that he had to pass the library to leave the church. He estimated that the entire interaction was no longer than one minute in duration.

When asked when he first interacted with the police, Defendant stated that three officers came up to him while he was working in a hay field and that a detective spoke to him. Defendant said that, at the time, he had no idea why they had come to talk to him. Defendant stated that the detective read him his *Miranda* rights and that he agreed to waive them; he noted that he had nothing to hide. Defendant realized after the detective mentioned the church that he was referring to "the pepper spray ordeal."

When asked whether he told the detective his version of events, Defendant stated,

Yes, I did. I tried to, you know, when he asked me about the incident at the church, I told him I had to stop to use the restroom, you know, I was going to pull up in the parking lot and use it, but when I seen her I thought well, the church is a safe place, you know, and once she let me in, but going back to the hay field, once he asked me that question and I told him, and I told him and he said no, that wasn't what you was there for.

Defendant stated that he was not told why he was arrested until about 10:00 p.m., when officers moved him from booking into the jail.

On cross-examination, Defendant testified that, on the morning of the incident, he drove "off the mountain road into Mecca Pike, crossed [Highway] 411, 3rd Street, and turned right at the stop sign" in an effort get to the "Jiffy on 30." Defendant agreed that he crossed Highway 411, a four-lane highway with gas stations, restaurants, and grocery stores. He stated that he did not stop at any of the businesses to use the bathroom because he was "not going that way."

- 14 -

Defendant testified that he had his dog in the car with him and that he was wearing a seatbelt when he pulled into the church parking lot. Defendant said that he only told Ms. Stewart that he was coming from Polk County, not that he needed directions to Polk County.

Defendant testified that he did not hear any noises or see anyone else in the church when he entered. He stated that he initially walked in front of Ms. Stewart, then she walked in front of him to turn on the lights. When shown the photograph of the library, Defendant agreed that Ms. Stewart's notations of where each person was standing were accurate. He stated, though, that he was not blocking the door; rather, he asserted that he was "around the corner of the door." Defendant said that he was approximately the same size at the time of trial as he was at the time of the incident.[3]

Defendant denied telling Ms. Stewart that he "wasn't there to use the restroom." He stated that he told her he "was there just to use the restroom." Defendant denied that he pointed or advanced toward Ms. Stewart when he told her to "get her a-- over there" or that he gave her any reason to think that he was going to do something to her.

Defendant testified that, after Ms. Stewart pepper sprayed him, he left and drove "[b]ack to the mountain road" and that he asked an individual for water to wash his eyes, but the individual did not have any. Defendant acknowledged that he did not call the police or go to the nearby police station to "report about some crazy girl spraying [him] with pepper spray at the church[.]"

Defendant averred that there was not any particular time he was supposed to arrive at the hay field that morning. He acknowledged Mr. Shelton's testimony that Mr. Shelton loaded 100 bales of hay by himself, but Defendant asserted that someone else was helping Mr. Shelton. Defendant stated that he was not supposed to help load the hay, he "was just supposed to have been there." He agreed that he was supposed to show up "voluntarily" and "do nothing." Defendant stated that he was not getting paid and that he was helping a friend who had Covid. Defendant later added that he was going to collect money and give it to his sick friend and that Mr. Shelton gave Defendant $300. Defendant said that he did not tell Mr. Shelton what happened when he arrived at the field because it was none of Mr. Shelton's business. Defendant agreed that it was not a "big deal" that he was pepper sprayed. When asked whether he felt that what Ms. Stewart did was wrong, Defendant replied, "No. I mean, she's the one that had the pepper spray. She's the one that sprayed me. Why did I want to go broadcast it to everybody, you know."

---

[3] We note that the presentence report reflects that Defendant was five feet, nine inches tall and weighed 240 pounds.

Defendant did not recall telling Detective Richmond that he had not been in Etowah that day. Defendant acknowledged that he did not tell Detective Richmond he had tried to go somewhere else or that Ms. Stewart had pepper sprayed him. Defendant denied that he stopped at the church to ask for directions, and he noted that he was familiar with the area.

The trial court announced that it found Defendant guilty as charged of attempted aggravated kidnapping.

At sentencing, the trial court discussed the verdict as follows:

> . . . I rested a verdict of guilt beyond reasonable doubt because bluntly, [Ms.] Stewart was just much more credible than you were, [Defendant]. She exhibited a good appearance and demeanor. I did not find that despite efforts at cross that she gave differing statements as to material matters. She may have used words a little bit differently, but when people attempt to describe the same incident a number of times, the core can stay the same, a few words might differ, but the truth still holds in all those versions.
>
> . . . .
>
> The other thing is, is subsequent behavior. Who was telling the truth. You have a young woman who was afraid, objectively pulled pepper spray and what does she do? She calls 911. What do you do but flee. You run, you hide. You don't talk about it to anyone. You just wash your face of the pepper spray . . . . You then go late and show up when you were supposed to bale hay . . . . Whose subsequent behavior resonated more as truth. That was objectively, and not even close, [Ms.] Stewart.

After the sentencing hearing, the trial court imposed a sentence of five years—one year in confinement, which was satisfied by Defendant's pretrial incarceration, and four years of supervised probation. The trial court subsequently denied Defendant's motion for new trial, and Defendant timely appealed.

## Analysis

### I.   Sufficiency of the Evidence

Defendant contends that the evidence was insufficient to establish that (1) he acted "with the specific intent to remove or confine Ms. Stewart so as to interfere substantially with her liberty"; (2) he took a substantial step toward accomplishing the same; and (3) Ms. Stewart "suffered bodily injury in conjunction with the attempted removal or

confinement." Defendant specifically argues that the State did not prove that he "specifically intended to interfere with Ms. Stewart's liberty to such a substantial degree as contemplated by our legislature" because the length of time during which Ms. Stewart was confined in the library was only fourteen seconds. Defendant also relies upon his own testimony regarding the reasons for which he initiated contact with Ms. Stewart and his explanation of the incident to dispute Ms. Stewart's account of events, arguing that her fears and feelings of being threatened were unreasonable. Relative to bodily injury, Defendant states both that the injury to Ms. Stewart's eyes did not occur "as a result of" or simultaneously enough with the attempted false imprisonment. The State responds that the evidence is sufficient.

We note that, after Defendant waived the right to a jury trial, "the trial court as the trier of fact evaluated the credibility of witnesses, determined the weight given to testimony, and resolved all conflicts in the evidence." *State v. Stone*, No. W2021-01044-CCA-R3-CD, 2022 WL 3273651, at *3 (Tenn. Crim. App. Aug. 11, 2022) (quoting *State v. Johnson*, No. M2018-01216-CCA-R3-CD, 2019 WL 3074071, at *8 (Tenn. Crim. App. July 15, 2019), *no perm. app. filed*.), *perm. app. denied* (Tenn. Dec. 19, 2022). The trial court's verdict has equivalent weight to a jury verdict. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978); *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999).

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As relevant here, aggravated kidnapping is false imprisonment "[w]here the victim suffers bodily injury[.]" Tenn. Code Ann. § 39-13-304(a)(4). "A person commits the

offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a). This court has previously discussed that substantial interference with liberty "does not require . . . any particular duration . . . of confinement. It is the *purpose* of the removal or confinement and not the distance or duration that supplies a necessary element of aggravated kidnapping." *State v. Taylor*, 63 S.W.3d 400, 408 (Tenn. Crim. App. 2001) (internal citations omitted) (citing *State v. Dixon*, 957 S.W.2d 532, 535 (Tenn. 1997), *overruled on other grounds by State v. White*, 362 S.W.3d 559 (Tenn. 2012)), *perm. app. denied* (Tenn. Oct. 8, 2001).

Bodily injury includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(3).

A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

> (1) [i]ntentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a). For conduct to constitute a substantial step, the person's entire course of action must be corroborative of the intent to commit the underlying offense. Tenn. Code Ann. § 39-12-101(b).

In the light most favorable to the State, the evidence was sufficient for the trial court, as the finder of fact, to determine that Defendant acted with the intent to remove or confine Ms. Stewart so as to substantially interfere with her liberty and took a substantial step toward commission of the offense, as corroborated by his entire course of conduct. The evidence at trial reflected that Defendant pulled up beside Ms. Stewart in the church parking lot and asked for directions and if he could use the restroom. Ms. Stewart testified that Defendant's "body language" made her uneasy. The surveillance recordings showed

that Defendant did not appear to be hurried as he entered the empty church and walked into the restroom. Defendant remained in the restroom for thirty-three seconds before walking to the library and entering the open door.

Ms. Stewart testified that Defendant entered the library and stood inside the door such that it could not be closed and she could not leave. She stated that Defendant told her that he was not there to use the restroom. After Ms. Stewart declared that she had pepper spray, Defendant said that he did not care about pepper spray, pointed toward the hallway restroom, and told her to "get [her] a-- in there" while leaning toward her and taking a step forward. Ms. Stewart testified that she did not feel free to leave because she thought Defendant would stop her if she tried. We note that Defendant's argument about the short duration of the attempted confinement or removal is unavailing. *See Taylor*, 63 S.W.3d at 408.

After Ms. Stewart pepper sprayed Defendant, he reported late to the hay field and did not mention to Mr. Shelton what happened. When the police questioned Defendant, he initially denied having been in Etowah that day but later admitted he had been at the church to use the restroom. Defendant's lack of candor with the police, his statement to the police that he was familiar with the area, and Defendant's statement to Ms. Stewart that he was not there to use the restroom could have led a reasonable factfinder to conclude that Defendant's initial inquiries were a pretext to gain access to Ms. Stewart.

The evidence was sufficient for the trial court to find that Defendant's course of conduct in creating a situation in which he and Ms. Stewart were alone, standing in the library doorway and blocking it, combined with the aforementioned verbal statements, pointing, and command for Ms. Stewart to "get [her] a-- in there," then afterward attempting to conceal his involvement from the police evinced an intent to commit false imprisonment, as well as a substantial step toward accomplishing it. We note that the trial court, by its verdict, credited Ms. Stewart's testimony over that of Defendant regarding his wording and the meaning it conveyed. The trial court's verdict also credited Ms. Stewart's interpretation of the situation as reasonable and not, as Defendant states, "unfounded fears and assumptions[.]"

The evidence was also sufficient for the trial court to find that Ms. Stewart's pepper spray injury was suffered in conjunction with the attempted removal or confinement. Ms. Stewart testified that some pepper spray rebounded onto her while she discharged it and that she was further exposed to the cloud of pepper spray when she followed Defendant to ensure he was leaving. Her eyes were irritated for about one week afterward. Defendant does not assert that the pain and irritation in Ms. Stewart's eyes do not qualify as bodily injury.

Defendant's argument that Ms. Stewart's injury was not sufficiently simultaneous with the attempted kidnapping is unavailing. Although Defendant relies upon Ms. Stewart's testimony that the majority of her exposure to the pepper spray occurred when she stepped into the hallway to ensure Defendant had left, she also testified that some pepper spray rebounded onto her as she sprayed it. The evidence was sufficient to establish that Ms. Stewart suffered bodily injury during the attempted kidnapping.

We note that Defendant's assertion that Ms. Stewart did not suffer bodily injury "as a result of" the attempted false imprisonment ignores basic principles of causation—but for Defendant's attempt to confine or remove Ms. Stewart, she would not have been exposed to pepper spray, and her eyes would not have been injured.

Because the evidence was sufficient to support Defendant's conviction, he is not entitled to relief on this basis.

## II.    Trial Court's Leaving the Bench

Defendant contends that structural constitutional error occurred when the trial court left the bench three times during Ms. Stewart's testimony to facilitate defense counsel's refreshing her recollection with her audio-recorded statements. Defendant's requested relief is a new trial. The State responds that Defendant has waived consideration of this issue by failing to contemporaneously object and that he is not entitled to plain error relief. Defendant argues in his reply brief that structural constitutional errors are properly raised for the first time in a motion for new trial and, alternatively, that plain error relief is warranted.

In *State v. Vance*, 596 S.W.3d 229, 253 (Tenn. 2020), our supreme court specifically discussed that the "obligation to preserve issues [for appeal] applies to constitutional issues as well as non-constitutional ones." *Id.* (citations omitted). Because Defendant made no contemporaneous objection and raised this issue for the first time in the motion for new trial, we will examine it for plain error.

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Id.* at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is

clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. Defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

Defendant has not established that a clear and unequivocal rule of law has been breached. Defendant's constitutional argument relies upon the right to have "all critical stages of a criminal trial [be] conducted by a person with jurisdiction to preside." *Gomez v. U.S.*, 490 U.S. 858, 876 (1989) (citations and quotation marks omitted). Defendant argues that the trial judge "abdicate[d] his duty to preside over a criminal case" by leaving the bench at the State's request three times "during Ms. Stewart's testimony." In his reply brief, Defendant argues that the trial court left the bench "while the complaining witness was on the stand, without recessing the proceedings, thus leaving the ongoing trial without a neutral and detached arbiter to preside."

Defendant's characterization of the trial court's absence as occurring during Ms. Stewart's testimony is not well-received. Although the trial court did not use the word "recess" to describe the occasions when it left the bench, the intent of the trial court and the parties was clearly that the proceedings would be paused while Ms. Stewart's recollection was refreshed. On the first occasion, defense counsel asked the trial court if the parties could "use this time for a brief time out," and the trial court responded specifically that the parties could use the restroom, which would not occur if the proceedings were going to continue in the trial court's absence.

On each occasion, the trial court left the bench, in what was most accurately described as a recess, in an attempt to adapt the procedure set forth in Tennessee Rule of Evidence 612 for refreshing a witness's recollection with a written[4] statement, in which the finder of fact does not hear the contents of the prior statement. We cannot conclude that this is equivalent to leaving the bench during Ms. Stewart's testimony.

We emphasize, though, that the best practice in this situation would be to explicitly declare a recess. We note that the trial court could have remained in the courtroom while

---

[4] We note that Rule 612 only addresses written statements; however, this court has acknowledged that audio-recorded statements may also be used to refresh a witness's recollection. *State v. Looney*, No. M2014-01168-CCA-R3-CD, 2016 WL 1399344, at *26 (Tenn. Crim. App. Apr. 7, 2016) (discussing that, although Rule 612 and the Advisory Commission Comments do not address recorded statements, "we cannot conclude that the medium used for documenting a statement during a police investigation would preclude its use for the purposes of refreshing a witness's memory of their own statement."), *perm. app. denied* (Tenn. Aug. 18, 2016); *see State v. Torres,* No. E1999-00866-CCA-R3-DD, 2001 WL 245137 (Tenn. Crim. App. Mar. 13, 2001), *rev'd in part on other grounds by State v. Torres*, 82 S.W.3d 236 (Tenn. 2002) (discussing that Rule 612 does not prohibit using non-written materials to refresh a witness's memory and noting that a recording "is simply a modern substitute for handwritten notes").

Ms. Stewart's recorded statements were played; bench trials require trial judges to separate their consideration of evidentiary issues, during which they may become privy to inadmissible evidence, from their role as the finder of fact.

We note that Defendant's complaint regarding the lack of transcription during the recesses could easily have been addressed if defense counsel had objected and requested that the proceedings continue on the record. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

Defendant has also failed to establish that a clear and unequivocal rule of law exists in Tennessee regarding the structural or non-structural nature of a *Gomez* error. Defendant discusses case law from other jurisdictions in which those courts found that "the absence of a judge from the bench during trial" is constitutional error; however, there is a split of federal and state authority regarding the structural or non-structural nature of the error.

In addition, all of the cases Defendant cites are factually distinguishable from the situation in this case, and he has not carried the burden of establishing that a *Gomez* error occurred. In *Riley v. Deeds*, 56 F.3d 1117, 1119-20 (9th Cir. 1995), the trial court was absent from the courtroom when, after jury deliberations began, the judge's law clerk granted the jury's request to have the victim's testimony read back to them. The Ninth Circuit Court of Appeals noted that the judge "was not only absent from the readback, he also exercised no discretion in the decision whether to permit [the victim]'s testimony to be read back, or how much of it should be read or whether other testimony also should be read." In addition, the court discussed a split in authority among federal courts regarding whether "a judge's absence during the trial process is reversible error per se or whether it is the type of error which may be subjected to harmless error analysis." *Id.* at 1120. The court noted that, in "virtually all" cases applying a harmless error analysis, there was "a finding of express or implied waiver of the right to the judge's presence, or a determination that the judge, while technically absent, remained in 'effective control' of the proceedings." *Id.* at 1121 (citations omitted). The court also stated that, in all the harmless error cases, "there has been at least a judicial decision regarding the nature of the proceeding that would take place in the judge's absence or an explicit decision by the judge that his presence during the proceeding was not required[.]" *Id.* (citation omitted).

In the other cases Defendant cites, state supreme courts have concluded that a judge's leaving the courtroom during the presentation of evidence was constitutional error, although they reached different conclusions about whether the error was structural. *See State v. Arguello*, 873 N.W.2d 490, 492-94 (S.D. 2015) (holding that the judge's absence from the courtroom while the victims' forensic interviews were played for the jury was

non-structural constitutional error); *People v. Salyer*, 80 P.3d 831, 836-8 (Colo. 2003) (holding that a judge's absence from the courtroom when the defendant's video-recorded statements were played for the jury was non-structural constitutional error); *People v. Vargas*, 673 N.E.2d 1037, 1039 (Ill. 1996) (holding that structural constitutional error occurred when the judge left the courtroom to take a telephone call during the defendant's cross-examination of a witness, which continued in the judge's absence).

In short, Defendant does not cite any case law, binding or persuasive, to suggest that the trial court's decision to grant the State's request to absent itself from the courtroom while defense counsel refreshed Ms. Stewart's recollection runs afoul of constitutional protections, whether structural or non-structural. Refreshing a witness's recollection when the prior statement is not being offered as evidence does not require the trial court to make an evidentiary determination, resolve an objection, or otherwise exercise its authority, and the absence did not occur during the presentation of evidence. *See, e.g., id.* (discussing that the judge was not present when the jury sent a request for the testimony to be read back, that the judge's law clerk decided to grant the request, and that the jury "was then given effective control of what testimony and how much of it would be read"); *Salyer*, 80 P.3d at 837 (discussing that no objections were made related to the videotapes' being played and that the court "did not delegate to others the authority to exercise any judicial function, such as entering judgment, issuing rulings, or presiding over argument"); *Vargas*, 673 N.E.2d at 1039 (discussing that an objection was made during testimony in the judge's absence). Defendant has not established that a clear and unequivocal rule of law has been violated, and he is not entitled to plain error relief on this basis.

In addition, Defendant includes in his plain error argument that one of the "clear and unequivocal rules of law" violated by the trial court's leaving the bench was Tennessee Supreme Court Code of Judicial Conduct Rule 10, Canon 2.7, which requires that a judge "shall hear and decide matters assigned to the judge, except when disqualification is required[.]" To the extent that Defendant raises this alleged violation separately from his constitutional issue, it has been raised for the first time in his reply brief and is waived. *See* Tenn. R. App. P. 36(a).

Similarly, in his plain error argument, Defendant states that the trial court violated its duty to "rule upon the admissibility of evidence such as a witness's prior inconsistent statement" and cites as examples Tennessee Rule of Evidence 103(c), providing that "[i]n jury cases, proceedings shall be conducted to the extent practicable so as to prevent inadmissible evidence from being suggested to the jury by any means," and Tennessee Rule of Evidence 803(26), the hearsay exception for prior inconsistent statements of a testifying witness. In addition to failing to lodge any evidentiary objection related to Ms. Stewart's prior statements, Defendant did not include an issue related to Rules 103(c) or 803(26) in his motion for new trial. The motion for new trial cited Tennessee Rule of

Evidence 613, which governs admission of extrinsic evidence of prior statements. Defendant appears to have abandoned the Rule 613 argument on appeal.

"It is well-settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal." *State v. Alder*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001) (citation omitted). Accordingly, to the extent Defendant has attempted raise an evidentiary issue based upon Rules 103(c) and 803(26), it has been waived. We note that both rules are inapplicable to this case—Rule 103(c) applies to jury trials, and neither Defendant nor the State attempted to introduce extrinsic evidence of Ms. Stewart's prior statements such that the hearsay exception would apply.

To the extent Defendant utilizes the above-referenced evidentiary rules to raise the trial court's alleged failure to rule upon the admissibility of Ms. Stewart's prior statements, no such duty was neglected because, again, neither party sought to admit the statements as substantive evidence. Defendant is not entitled to plain error relief on this basis.

## Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE